Opinion issued April 7, 2005









     






In The
Court of Appeals
For The
First District of Texas




NO. 01-04-00017-CV




CAROLYN LEWIS, Appellant

V. 

TEXAS DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES,
Appellee




On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2003-00805J




MEMORANDUM OPINION

          Appellant, Carolyn Lewis, appeals the trial court’s judgment terminating the
parent-child relationship between her and her daughter, C.L.


 Lewis contends that the
evidence provided at trial is factually insufficient to support the trial court’s finding
that termination of the parent-child relationship is in the best interest of the child. We
affirm.
Facts
          In June 2002, Lewis pleaded guilty to the state jail felony of forgery of a
commercial instrument. The trial court placed her on five years deferred adjudication
community supervision, imposed a $500 fine, and ordered her to serve fifty-eight
days’ confinement. The terms of her community supervision required Lewis to (1)
refrain from using alcohol and drugs; (2) complete three hundred hours of community
service; (3) report to her community supervision officer each month; (4) submit to
random urine specimen analysis; (5) secure stable employment; (6) pay the required
fees; (7) submit to an alcohol and drug evaluation and treatment plan; and (8) pay
restitution in the amount of $1,716.64. 
          While incarcerated, Lewis learned she was pregnant with her first child. Lewis
testified that, after her release, she completed the drug assessment and that her 
community supervision officer did not require that she participate in any
rehabilitation program. Lewis, however, admitted that she was not honest with her
community supervision officer about her continued drug abuse.
          During her pregnancy, Lewis received prenatal care at Hermann Hospital. 
Doctors considered her pregnancy to be high risk for a number of factors, including
her age and her rheumatoid arthritis. Knowing this information, Lewis continued to
use cocaine throughout her pregnancy. Lewis testified that she knew at the time that
her cocaine use endangered the well-being of her child. 
          Lewis gave birth to C.L. on January 23, 2003, and both she and her baby tested
positive for cocaine. Five days later, the Texas Department of Protective and
Regulatory Services (“TDPRS” or “the agency”) filed its original petition for
protection of a child, for conservatorship, and for termination in a suit affecting the
parent-child relationship. The agency, the trial court, and Lewis entered into an
agreed order, placing C.L. in the temporary managing conservatorship of the agency. 
The agency offered services to Lewis to help her overcome her cocaine addiction and
to reunite her with C.L. In particular, the agency offered to enroll Lewis in a
seventeen-week outpatient drug treatment program that included parenting classes
and therapy. In return, the TDPRS requested that Lewis procure stable housing and
employment. Lewis, however, chose not to participate in or complete the program. 
She explained at trial that she failed to participate because she continued to use
cocaine. 
          Between January and May 2003, Lewis visited C.L. on two occasions, at a
location close to her home. After the agency transferred the visits to another location,
Lewis did not attempt to visit her daughter. Lewis explained that, at the time, she had
been evicted from her home, and had no money, nor any transportation. Lewis further
stated that she was not honest with the agency’s case worker concerning her
continuing drug addiction. 
          In February 2003, Lewis failed to submit a urine sample as required by the
terms of her community supervision. She admitted that the sample would have tested
positive for cocaine, had she submitted one. In March 2003, Lewis submitted a urine
sample that tested positive for cocaine.
          In May 2003, the State moved to adjudicate Lewis’s guilt for the state jail
felony forgery conviction, contending that she had failed to comply with various
terms of her community supervision, including: testing positive for cocaine; failing
to pay required fees; failing to meet with her probation officer; and failing to
complete her community service requirements. As a result of these allegations, the
trial court ordered Lewis to six months’ confinement, but allowed her to remain on
the deferred adjudication community supervision. 
          While incarcerated, Lewis signed a release of information, completed a twelve-
step drug rehabilitation program, and completed a six-month substance abuse
program. Each day, Lewis attended three group therapy sessions, and she completed
parenting classes twice per week. As of the date of trial in this case, Lewis remained
incarcerated but was to be released on community supervision within one week. The
record contains no information concerning her progress outside incarceration other
than the four months before her arrest for violations of her community supervision. 
          According to Lewis, she and the child’s father, Lockridge, were united in a
common law marriage for thirteen years, and they continued to live together after
C.L.’s birth. Lockridge has a history of criminal behavior. In 1983, a trial court
found him guilty of attempted capital murder and aggravated robbery and assessed
punishment at twenty years’ confinement. More recently, in November 2001,
Lockridge pleaded guilty to possession of cocaine, and the trial court assessed
punishment at one hundred eighty days’ confinement. 
          Lewis stated that she planned to live with Lockridge after her release, and that
they were going to “work on” their marriage. Lockridge did not participate in any of
the agency services directed at reuniting Lewis with C.L. He never signed a
statement of paternity, nor submitted to a paternity test, as requested by the agency. 
Lockridge made no attempts to meet with C.L. or to confer with Lewis’s caseworker
until June 27, 2003, when Lewis was jailed.
          Caseworker Sheila Caesar testified that the agency diligently tried to work with
Lewis and that the agency’s initial goal was to reunite C.L. with her mother and
father. This goal changed to termination at a planning meeting in July 2003. The
agency contends this change was due to Lewis’s incarceration. 
          At trial, Lewis maintained that her parental rights should not be terminated
because during her incarceration she underwent treatment and participated in
parenting classes. Upon her release from jail, Lewis planned to go to a halfway
house, so that she could continue receiving treatment and assistance in obtaining
employment. Lewis also stated that she would complete the requirements of her
deferred adjudication community supervision and abstain from using drugs. 
          This trial commenced in November 2003. After the trial, the trial court
terminated Lewis’s parental rights. The trial court denied Lewis’s motion for new
trial and found her to be indigent. This appeal followed.


Standard of Review
          In termination of parental rights cases, “due process requires that the State
support its allegations by at least clear and convincing evidence” to reduce the risk
of erroneous termination. Santosky v. Kramer, 455 U.S. 745, 747-48, 102 S. Ct.
1388, 1391-92 (1982); In re B.L.D., 113 S.W.3d 340, 353-54 (Tex. 2003). “‘Clear
and convincing evidence’ means the measure or degree of proof that will produce in
the mind of the trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.” In re C.H., 89 S.W.3d 17, 25 (Tex. 2002) (quoting Tex.
Fam. Code Ann. § 101.007 (Vernon 2002)); see also Robinson v. Tex. Dep’t of
Protective & Regulatory Servs., 89 S.W.3d 679, 688 (Tex. App.—Houston [1st Dist.]
2002, no pet.). 
          In our review of a challenge to the factual sufficiency of the evidence, we give
“due consideration” to evidence that the fact finder reasonably could have found to
be clear and convincing. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002) (citing In re
C.H., 89 S.W.3d at 25). We examine whether the evidence is such that a fact finder
reasonably could form a firm belief or conviction about the truth of the State’s
allegations, and whether the disputed evidence is such that a reasonable fact finder
could not have resolved that disputed evidence in favor of its finding. Id. An
appellate court should not reverse if, considering all of the evidence in the record,
the fact finder reasonably could have formed a firm conviction or belief that the
parent committed one of the alleged grounds of termination and that the termination
is in the best interest of the child. In re C.H., 89 S.W.3d at 27. 
Discussion
          The natural right that exists between parents and their children is one of
constitutional dimension. See In re J.F.C., 96 S.W.3d at 273; see also In re C.H., 89
S.W.3d at 26. A parent’s right to “the companionship, care, custody and management
of his or her children” is a constitutional interest “far more precious than any property
right.” Santosky, 455 U.S. at 758-59, 102 S. Ct. at 1397 (quoting Stanley v. Illinois,
405 U.S. 645, 651, 92 S. Ct. 1208, 1212 (1972)). In a case terminating parental
rights, therefore, we strictly scrutinize the proceedings and strictly construe the law
in favor of the parent. Holick v. Smith, 685 S.W.2d 18, 20 (Tex. 1985). 
          Under Texas law, to terminate a parent-child relationship, a trial court must
find by clear and convincing evidence that (1) termination is in the best interest of the
child; and (2) the parent committed one or more of the acts specifically named in the
Texas Family Code as grounds for termination. See Tex. Fam. Code Ann. § 161.001
(Vernon 2002); In re L.M., 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.]
2003, no pet.). Proof of one element does not relieve the petitioner from establishing
the other. Holley v. Adams, 544 S.W.2d 367, 370 (Tex. 1976). It is inconsequential
whether the actions occurred before or after birth. In re S.F., 32 S.W.3d 318, 322
(Tex. App.—San Antonio 2000, no pet.); Avery v. State, 963 S.W.2d 550, 553 (Tex.
App.—Houston [1st Dist.] 1997, no writ). 
          In her sole issue, Lewis concedes that she committed the act of abuse, but
contends that the evidence is factually insufficient to support, by clear and convincing
evidence, the trial court’s finding that termination of her parental rights is in C.L.’s
best interest. The agency responds that the evidence was such that a fact finder
reasonably could have formed a firm belief or conviction that termination of Lewis’s
parental rights was in C.L.’s best interest. 
          In determining the best interest of the child, courts examine a number of
factors, including: (1) the desires of the child; (2) the emotional and physical needs
of the child now and in the future; (3) the emotional and physical danger to the child
now and in the future; (4) the parental abilities of the individual seeking custody; (5)
the programs available to assist the individual; (6) the plans for the child by these
individuals; (6) the stability of the home; (7) the acts or omissions of the parent that
indicate that the existing parent-child relationship is not a proper one; and (8) any
excuse for parent’s acts or omissions. Holley, 544 S.W.2d at 371-72; see also In re
K.C.M., 4 S.W.3d 392, 394-95 (Tex. App.—Houston [1st Dist.] 1999, pet. denied). 
These factors, often referred to as the “Holley” factors, are not exhaustive; some listed
may not apply, while other factors not included on the list may also be appropriate. 
In re C.H., 89 S.W.3d at 27. Evidence that proves one or more statutory grounds for
termination may also constitute evidence illustrating that termination is in the child’s
best interest. Id. at 28. Using these factors, we examine whether the evidence is
factually sufficient to support the trial court’s finding that termination is in C.L.’s best
interest. 
Child’s Desires
          The record does not indicate C.L.’s desires because she was an infant at the
time of trial.
Child’s Emotional and Physical Needs 
          Lewis contends that no evidence exists that C.L.’s needs are better served by
termination. The caseworker testified that C.L. does not have any special needs, but
that C.L.’s current placement in a foster home was meeting both her physical and
emotional needs, and that it is in C.L.’s best interest to remain in the foster home. 
Possibility of Emotional and Physical Danger 
          Lewis ingested cocaine during her high-risk pregnancy, and both mother and
child tested positive for cocaine at C.L.’s birth. Additionally, Lewis continued to use
drugs after giving birth to C.L., knowing that she needed to remain drug-free to be
reunited with her child. The trial court reasonably could have considered the
possibility of emotional or physical danger to C.L. if Lewis were to relapse upon her
release from jail. The trial court also reasonably could have considered the emotional
danger to C.L. from a continuing relationship with a mother who has not been, and
may not be, present in C.L.’s life because of drug use or incarceration, thus disrupting
any permanency or stability for C.L. Lewis presented little evidence of any support
system in place–i.e., friends or relatives that could care for C.L.–should such
situations arise. Her mother and her aunt reside in Fort Worth, and Lewis’s counsel
conceded to the trial court that neither was able to offer C.L. a place to live. The trial
court reasonably could have inferred that Lewis’s risk of relapse is high because she
continued to ingest cocaine while on community supervision for a felony conviction,
and while her child lived in protective custody from the time of birth.
Acts or Omissions Indicating Improper Parent-Child Relationship
          Lewis’s drug abuse, and her failure to comply with the agency’s reunification
plan before her incarceration, establishes an improper parent-child relationship. Her
drug abuse during her pregnancy endangered C.L.’s well-being. Lewis testified that
she was aware that her drug use endangered her child. The trial court reasonably
could have inferred that Lewis was not a prudent parent. 
Excuse for the Parent’s Acts or Omissions
          Lewis stated that “I have no excuse for my addiction. I’ve asked God for
forgiveness for that, that’s part of my past but my future, I’m gonna stay clean and
sober.” She stressed her desire to move on and provide a loving home for her
daughter. 
Parental Abilities of Lewis and the Individuals Seeking Custody 
          From birth, Lewis never undertook parental responsibility for C.L. Her
parental responsibilities have been performed by others, namely the agency and foster
parents. Lewis notes that she completed drug rehabilitation and parenting classes
while incarcerated, but before her incarceration, she did not demonstrate any ability
to maintain a stable home and employment, or to remain drug-free. Lewis violated
numerous conditions of her community supervision, including: testing positive for
cocaine; failing to pay required fees; failing to meet with her probation officer; and
failing to complete her community service requirements. As a result, the trial court
adjudicated her guilty of a felony. During Lewis’s incarceration, she never contacted
her caseworker to inquire as to C.L.’s health or welfare. 
Plans for the Child by the Individual or Agency Seeking Custody
          The record contains evidence that Lewis plans to move into a halfway house
that does not allow children. She testified that she can obtain employment, and
desires to offer C.L. a loving home. She also testified that she will complete
parenting classes after her release. In contrast, the caseworker for the agency testified
that C.L. is adoptable, and that prospective adoptive parents exist. 
 
Stability of the Home or Proposed Placement
          As of the date of trial, Lewis did not have a home. She planned to live at a
halfway house for up to one year, and she stated that “employment was not a
problem.” The halfway house, however, would not allow C.L. to live with Lewis. 
Further, Lewis admitted that her husband is not involved with C.L. and that she has
not discussed the situation with him, therefore, she is not aware of his “status on it.” 
It is unclear if Lockridge, who has a significant criminal history, could be an
influence on C.L.’s life. The caseworker testified that she believes it is in C.L.’s best
interest to remain in her foster home and that her current foster mother expressed a
desire to adopt C.L. 
Programs Available to Assist Individuals Seeking Custody to Promote the Best
Interest of the Child 

          Lewis stresses that she has completed parenting, substance abuse, and other
classes during her incarceration. After her child was born, however, Lewis refused
to complete similar courses that the agency recommended. During that time, she
refused to comply with the requirements of her community supervision. Lewis tested
positive for cocaine, failed to pay the required fees, and failed to meet with her
probation officer. Her choices resulted in her arrest and subsequent incarceration. 
 
Application of the Holley Factors
          Lewis contends that the evidence described above is factually insufficient to
support the trial court’s judgment. She relies on In re K.C.M. 4 S.W.3d 392. In
K.C.M., this court held that the evidence was factually insufficient to support the trial
court’s finding that termination of parental rights was in the best interest of the child. 
4 S.W.3d at 399. K.C.M., like the present case, involved a mother who abused drugs
and was incarcerated.


 
          In K.C.M., the mother, Martin, signed a plan with the TDPRS requiring her to
submit to random drug testing. Martin lived with K.C.M.’s paternal grandmother,
who agreed to monitor the situation. Id. at 396. During K.C.M.’s first year, Martin
tested positive for marihuana. Id. She also admitted to using crack cocaine on a daily
basis. Id. Martin was arrested for possession of crack cocaine and placed on deferred
adjudication. Martin was later arrested for possession of a crack pipe. Id. As a
result, she was adjudicated guilty, and sentenced to one year’s confinement. At the
time of her trial, Martin had seventy-five days left to serve in jail. Id. at 396. 
          Lewis contends that she, like Martin, completed drug treatment and parenting
programs and achieved trustee status while incarcerated. Lewis further contends that
she has a better education, a more significant work history, and has secured post-
incarceration transitional plans. Finally, she urges us to consider the fact that she had
six days left in jail until her release, while Martin had seventy-five more days. 
          When the mother in K.C.M. began using cocaine, however, she left her child
in her grandmother’s care. Here, Lewis has no relatives that are willing to care for
her child, as her counsel conceded at trial. Lewis testified that relatives might help
with C.L., but would not be able to take the child. Also, the mother in K.C.M. had
developed a relationship with her child for at least a year before her incarceration. 
During the first four months of C.L.’s life, when Lewis was not incarcerated, she
visited C.L. only twice and continued her drug use. Further, while in jail, the mother
in K.C.M. wrote numerous letters to the agency to inquire about her child’s well-being and discussed her plans to reunite with her child. Id. at 396. Here, Lewis
testified that she discussed C.L. when her caseworker visited her in jail. No evidence
exists, however, to indicate that Lewis contacted her caseworker to inquire about
C.L.’s well-being during her incarceration. K.C.M.’s mother did nothing to endanger
her child after she signed the service plan. Here, Lewis signed a service plan with the
agency shortly after giving birth; however, she continued her cocaine use in violation
of her community supervision and the plan. Finally, the mother in K.C.M. had only
seventy-five more days to completely satisfy the sentence requirements of her felony
conviction. Id. In contrast, although Lewis was scheduled for release from jail in
only six days, her felony sentence requirements remain in effect. Lewis remains on
the five year deferred adjudication community supervision that began on June 21,
2002. If Lewis fails to comply with the conditions of her community supervision, as
she previously has done, she is subject to confinement for 180 days to two years. See
Tex. Pen. Code Ann. § 12.35(a)-(b) (Vernon 2003). Lewis thus faces a possible
lengthier incarceration than K.C.M.’s mother, should the criminal trial court revoke
Lewis’s deferred adjudication. 
          We hold that the trial court reasonably could have formed a firm conviction or
belief that termination is in C.L.’s best interest, and that factually sufficient evidence
supports the trial court’s decision. We overrule Lewis’s issue. Cf. Robinson, 89
S.W.3d at 688-89 (affirming termination of parental rights when appellant was out
of prison before trial, but failed to remain drug-free). 

Conclusion
          We hold that the evidence is factually sufficient to support the trial court’s
finding that terminating the parent-child relationship is in the best interest of C.L. 
We therefore affirm the judgment of the trial court. We deny any pending motions 
as moot.


                                                             Jane Bland
                                                             Justice
 
Panel consists of Chief Justice Radack and Justices Higley and Bland.